United States of America v. Ingram

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: February 26, 2013          Decided: June 14, 2013)

Docket No. 12-1058

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

DWAYNE INGRAM,

*Defendant - Appellant*.

_____

Before: CALABRESI, POOLER, and RAGGI, *Circuit Judges*.

Defendant-Appellant Dwayne Ingram appeals from a February 28, 2012 criminal

judgment of the district court (Arcara, *J.*), which imposed a sentence of 144 months'

imprisonment.  Because we find that its sentence was substantively reasonable, the judgment of

the district court is AFFIRMED.

Judge Calabresi and Judge Raggi concur in separate opinions.

_____

> FONDA DAWN KUBIAK, Federal Public Defender's Officer,
> Western District of New York, Buffalo, NY (MaryBeth Covert, *on
> the brief*),  *for Defendant-Appellant*.

STEPHAN J. BACZYNSKI, Assistant United States Attorney, of Counsel (William J. Hochul, Jr., United States Attorney, *on the brief*), United States Attorney's Office, Western District of New York, Buffalo, NY, *for Appellee*.

Per Curiam:

Defendant-Appellant Dwayne Ingram ("Ingram") appeals from a February 28, 2012 criminal judgment of the district court (Arcara, *J.*), which imposed a sentence of 144 months' (12 years') imprisonment. Ingram had pleaded guilty to two counts of possession with intent to distribute and distribution of cocaine within 1,000 feet of public housing property. 21 U.S.C. §§ 841(a)(1); 860(a). On appeal, Ingram argues that the district court's sentence was substantively unreasonable. Because we find the sentence, which was below the *applicable* Guidelines range, to be substantively reasonable, the judgment of the district court is AFFIRMED.

## BACKGROUND

On October 7, 2010 an officer of the Lackawanna Police Department, operating undercover, entered the courtyard of the Gates Housing Project in Lackawanna, New York. The officer met with Ingram who, in each of two separate transactions, sold the officer approximately one-half gram of crack cocaine. Ingram was subsequently arrested, and an indictment charged him with two counts of possession with intent to distribute and distribution of cocaine within 1,000 feet of public housing property. 21 U.S.C. §§ 841(a)(1); 860(a). On August 29, 2011, Ingram pled guilty to both counts.

In preparation for sentencing, the probation department prepared a Presentence Investigation Report ("PSR"), which calculated a total offense level of 31 and a criminal history category of VI, for a Guidelines range of 188 to 235 months' imprisonment. In calculating the

2

Guidelines range, the PSR used the career offender enhancement, U.S.S.G. § 4B1.1. The district court adopted the PSR's Guidelines range but sentenced Ingram to a below-Guidelines sentence of 144 months' imprisonment.

Ingram now appeals, arguing that his sentence was substantively unreasonable.

## ANALYSIS

"The district courts have discretion to select an appropriate sentence, and in doing so are statutorily bound to consider the factors listed in [18 U.S.C.] § 3553(a), including the advisory Guidelines range." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). We review the district court's sentence under a "deferential abuse-of-discretion standard." *Id.* at 189 (internal quotation marks omitted). "This form of appellate scrutiny encompasses two components: procedural review and substantive review." *Id.* When reviewing for substantive reasonableness, "we will not substitute our own judgment for the district court's on the question of what is sufficient to meet the § 3553(a) considerations in any particular case" but "will instead set aside a district court's *substantive* determination only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *Id.* (internal quotation marks omitted).

The district court sentenced Ingram to 144 months' imprisonment, below the minimum sentence in the Guidelines range. While we have declined to adopt a *per se* rule, "[w]e recognize that in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006). Here, the district court's sentence, while perhaps severe, was well below the Guidelines range. This is not the exceptional case outside the range of permissible decisions.

3

In urging otherwise, Ingram argues, as he did to the district court, that the career offender enhancement overstates the seriousness of the felony crimes that put him in that category, as well as the risk of harm from future criminal conduct.  The record indicates that the district court considered Ingram's arguments and generally rejected them, finding aggravating circumstances to outweigh mitigating ones in Ingram's career offender designation.  Nevertheless, it was in recognition of some mitigating circumstances that the district court exercised its discretion to grant a Guidelines variance.  These decisions fell within the district court's discretion.

Accordingly, the judgment of the district court is AFFIRMED.

Calabresi, *Circuit Judge*, concurring:

Dwayne Ingram is serving a twelve year sentence for selling less than one gram of crack cocaine. More astonishingly still, his twelve year sentence is considerably *less* than the fifteen to nineteen year sentence recommended under the guidelines promulgated by the United States Sentencing Commission.

Ordinarily, someone who committed the crime which Ingram committed, and who had accrued a criminal history like his, would be subject to a guidelines range of 21 to 27 months. And even this, lesser recommended jail range derives from narcotics guidelines that "no one has ever accused . . . of being anything other than stringent." *United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (Lynch, J., concurring).

Why, then, was Ingram's guidelines range more than eight times higher than this already "stringent" recommendation? Because in a previous brush with the law, Ingram was caught selling 13.6 grams of crack; in another, as here, he sold less than one gram. Together, these drug felonies triggered the three-strikes provision known as the career offender guideline, U.S.S.G. § 4B1.1.

Given the great deference owed to district judges' sentencing decisions, *see United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc), and, of course, to the judgments our elected representatives have made about the proper punishment for drug crimes, I am required to join the panel in its holding that Ingram's sentence is not substantively unreasonable.

I write separately, however, to call attention to a procedural challenge that has been strangely absent from this case. The fact that Ingram never called the district court's

1

attention—or our own—to *United States v. Preacely*, 628 F.3d 72 (2d Cir. 2010), the case that most closely corresponds to Ingram's situation and that would have afforded him his best support both below and on appeal, leads me to believe that *Preacely*'s holding has not been sufficiently understood. My comments here are directed, then, to those in the bar and on the bench who may not have recognized the subtle but important contribution *Preacely* has made to our Circuit's law regarding career offenders.

## I. LEGAL BACKGROUND

Under the career offender provision of the sentencing guidelines, a defendant, eighteen years or older, who has at least two prior felony convictions for crimes of violence or controlled substance offenses and is charged with a third, becomes subject to a heightened offense level and an automatic assignment to criminal history category VI. In Ingram's case, the career offender enhancement raised his offense level from 10 to 31 and his criminal history category from V to VI.

Ingram's two previous drug felonies triggered the career offender guideline, so the district court was correct to include the relevant enhancements when it calculated the applicable guidelines range. In fact, it probably would have committed procedural error had it not done so. *See Cavera*, 550 F.3d at 189 ("A district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range.")

The district court's guidelines determination need not have ended there, however. The fact that a given guidelines range may apply does not always mean that it should. As

2

U.S.S.G. § 4A1.3(b) cautions sentencing courts, "a downward departure may be warranted" if "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." We have called this a "horizontal departure," *United States v. Mishoe*, 241 F.3d 214, 217 (2d Cir. 2001), as it results in a move from right to left on the sentencing grid.

Horizontal departures are not without constraints. The guidelines require sentencing judges to put "specific reasons" for their departures in writing. U.S.S.G. § 4A1.3(c). More importantly, at least in the present context, career offenders can only receive a one-level departure, from criminal history category VI to V. *Id.* § 4A1.3(b)(3). We have further held that horizontal departures under § 4A1.3(b) can only be based on "individualized consideration of the circumstances of a defendant's case." *Mishoe*, 241 F.3d at 218. Thus, general rules cannot be invoked to authorize departures whenever, for example, a defendant's criminal history involved only street-level sales or the current offense involves only a small quantity of drugs. *See id.* at 219. But a sentencing judge *can* consider factors such as "the amount of drugs involved in [the defendant's] prior offenses, his role in those offenses, the sentences previously imposed, and the amount of time previously served compared to the sentencing range called for by placement in [criminal history category] VI." *Mishoe*, 241 F.3d at 219.

In *United States v. Preacely*, we made clear—though perhaps not clear enough for the parties in the instant case—that a court's discretion to make a horizontal departure under § 4A1.3(b) differs from its discretion (under *United States v. Booker*, 543 U.S. 220 (2005),

3

and its heirs) to choose a sentence either above or below the guidelines' recommended range. Simply put, a horizontal departure is a decision to shift *to* a new guidelines range. Thereafter, a court must choose whether to depart *from* that new range in light of the statutory sentencing factors outlined at 18 U.S.C. § 3553(a). The first move is what Judge Raggi, at oral argument, helpfully termed a "pre-*Booker* departure": a recalibration of the applicable guidelines range in order to reflect the defendant's individualized circumstances. But these recalibrated guidelines remain advisory only, and *Booker* permits a second departure, either upward or downward, to what would then constitute a non-guideline sentence.

The district court in *Preacely* clearly understood its ability to give a non-guideline sentence under *Booker*. Not only did the sentencing judge state that he was "empowered to go to nothing," *Preacely*, 628 F.3d at 88 (Raggi, *J.*, dissenting), but he ultimately imposed a sentence of 94 months, exactly half the low end of the career offender guideline range. What concerned us in *Preacely* was the possibility that the district court did not realize it could make a pre-*Booker*, § 4A1.3(b) departure and adopt a criminal history category of V rather than VI. *Id.* at 81 ("It is ambiguous whether the sentencing judge understood that he was not required to treat Preacely as a 'sixth degree offender' . . . ."). Though we did not decide whether a pre-*Booker* departure was merited, *id.* at 82, we remanded for resentencing due to statements in the record suggesting that the district court thought the career offender guideline had to be employed, even if a sentence within that guideline did not have to be given.

4

I recognize that the distinction drawn in *Preacely* might strike some as unnecessary, or futile. *See, e.g., id.* at 89-90 and n.4 (Raggi, *J.*, dissenting). What does the discretion afforded by § 4A1.3(b) add to the discretion already guaranteed under *Booker*? Adjusting a defendant's criminal history and resulting guidelines range according to the *Mishoe* factors might seem to make little difference in a sentencing regime in which the guidelines are merely advisory, and judges must ultimately "impose a sentence sufficient, but not greater than necessary, to comply" with the sentencing factors mandated by statute. 18 U.S.C. § 3553(a).

There are two responses to this concern. The first is that the doubled exercise of discretion which the *Preacely* majority described—and worried the district court might not have understood—was not our invention; it is envisioned by the sentencing guidelines themselves. The Sentencing Commission is hardly unaware of *Booker*, of the advisory nature of the guidelines, or of the discretion district judges have to depart from them. Despite this, U.S.S.G. § 4A1.3 gives district judges the additional, constrained discretion to make the kind of horizontal departures I have described. If there is a redundancy here, it is one that our sentencing guidelines system explicitly establishes.

A second response suggests why this system makes sense. The so-called "anchoring effects" long described by cognitive scientists and behavioral economists, *see* Amos Tversky & Daniel Kahneman, *Judgment Under Uncertainty: Heuristics and Biases*, 185 Sci. 1124 (1974), show why the starting, guidelines-departure point matters, even when courts know they are not bound to that point. When people are given an initial numerical reference, even one they know is random, they tend (perhaps unwittingly) to "anchor" their subsequent

5

judgments—as to someone's age, a house's worth, how many cans of soup to buy, or even what sentence a defendant deserves—to the initial number given.[1] Because anchoring effects influence our judgments, we cannot be confident that judges who begin at criminal category VI and thence depart to whatever below-guidelines sentence they think appropriate would end up reaching the same "appropriate" sentence they would have reached had they, instead, started from the category V guideline range and departed from there.[2]

---

[1] *See, e.g.*, Daniel Kahneman, *Thinking, Fast and Slow* 119-28 (2011) (describing various studies of anchoring effects); Birte Englich, Thomas Mussweiler, & Fritz Strack, *Playing Dice with Criminal Sentences: The Influence of Irrelevant Anchors on Experts' Judicial Decision Making*, 32 Personality & Soc. Psychol. Bull. 188 (2006) (showing the effect of rolled dice on German judges' sentencing choices); Daniel M. Isaacs, Note, *Baseline Framing in Sentencing*, 121 Yale L.J. 426 (2011) (discussing the anchoring effects of sentencing baselines established under the U.S.S.G.); Nancy Gertner, *What Yogi Berra Teaches About Post-*Booker *Sentencing*, 115 Yale L.J. Pocket Part 137, 138 (2006), http://www.thepocketpart.org/2006/07/gertner.html ("In effect, the 300-odd page Guideline Manual provides ready-made anchors.").

[2] It is important to distinguish the guidelines' intended, salutary effect—promoting consistency and proportionality in sentencing—from the unintended anchoring effect that the guidelines can exert. Proper reliance on the guidelines is not only rational, but legally compelled. As our court has stated, en banc, "sentencing judges, certainly, are not free to ignore the Guidelines . . . . The Guidelines provide the starting point and the initial benchmark for sentencing, and district courts must remain cognizant of them throughout the sentencing process." *Cavera*, 550 F.3d at 189 (quotation marks and citations omitted). Anchoring leads to cognitive error not insofar as judges *intentionally* use the guidelines in an advisory fashion, but instead when "judges *irrationally* assign too much weight to the guidelines range, just because it offers some initial numbers." Ryan W. Scott, *Inter-Judge Sentencing Disparity After* Booker: *A First Look*, 63 Stan. L. Rev. 1, 45 (2010); *see also* Isaacs, *Baseline Framing*, *supra*, at 442 ("[G]uidelines are supposed to be actively considered in determining the appropriate sentence; they are not supposed to encourage irrational decisionmaking.").

Examples from the empirical literature illuminate this point. Studies have shown that judges weigh prosecution requests heavily when making decisions about sentencing and bail. *See* Englich et al., *Irrelevant Anchors*, *supra*, at 189. Such weight may well be rational in situations where the judge trusts a familiar prosecutor's experience and

Hence the advantage of a two-step process. Applying the *Mishoe* factors, courts can choose the more appropriate criminal history category without being influenced by anchoring effects. Its discretion at this stage is directed towards choosing a category, not picking the number of months the defendant will serve in prison. When the court turns to the latter task[3] and anchoring effects potentially come into play, the anchor being used—the guidelines range—will at least be one that the court had some discretion in determining. If the court decides to make a pre-*Booker* horizontal departure, any *Booker* departure that the court subsequently chooses will be influenced not by the category VI career offender range, but instead by the somewhat lower minimum starting point found one box to the left, under category V.

For all of these reasons, I believe our Court was right in *Preacely*—both in its reading of the guidelines and, given what we know about human decision-making, as a normative matter.

---

commitment to justice (over mere "winning"). The problem is that judges have also been shown—in fictionalized situations that psychologists have constructed to test for unconscious anchoring effects—to be influenced by prosecution requests *which they know were randomly generated. See id.* at 192-95. It is these latter, irrational effects that that make it important to pick the most appropriate guideline starting point even (or especially) when judges have the discretion to depart from that point.

[3] Significantly, a sentencing court might depart for different reasons during its pre-*Booker* and *Booker* exercises of discretion—that is, under U.S.S.G. § 4A1.3 and 18 U.S.C. § 3553(a). The grounds for a pre-*Booker* departure are narrower than those under § 3553(a). A court, for example, which has a policy disagreement with the crack sentences recommended under the guidelines would be justified in departing below the guidelines for that reason. *See Spears v. United States*, 555 U.S. 261, 264 (2009) (per curiam). It would not, however, be justified in horizontally departing to a lower guidelines range. *See Mishoe*, 241 F.3d at 218.

## II. APPLICATION

### A. Procedural Reasonableness

None of this is to insist that *Preacely* squarely governs the case currently before us. I make no claim that the facts of Ingram's case match those of Preacely's. By the time he was sentenced, Preacely had become a particularly strong candidate for a criminal history departure under U.S.S.G. § 4A1.3(b). Preacely's rehabilitation in the five years between his arrest and sentencing was remarkable: he never failed a drug test; "rendered significant assistance to the government"; completed a workforce development program sponsored by the district attorney; became one of his employer's most trusted workers; and, after attending voluntary counseling, married his longtime girlfriend, supported their daughter, and became a "youth advisor for a gang prevention program." *Preacely*, 628 F.3d at 76-77. Ingram has not, or not yet, matched this extraordinary record, although the BOCES certifications he has recently received are a commendable step in the right direction.

On the other hand, Ingram is serving a far longer sentence than Preacely, despite having been caught selling a significantly smaller quantity of drugs (less than one gram to Preacely's 21 grams) and having fewer prior drug convictions. Though both defendants were calculated to have a career offender guidelines range of 188-235 months, Preacely was sentenced to 94 months—reduced to 72 on remand—while Ingram, as noted earlier, is serving 144 months. The 96-month sentence that Ingram requested at sentencing was itself longer than that which prompted Preacely to appeal. All of this is relevant under *Mishoe* since "a comparison of the time served for prior offenses with the time to be served" is one

8

of the factors to be considered when determining what criminal history category to apply. 241 F.3d at 219.

That said, *Preacely* does not require our Court to decide whether a defendant such as Ingram should have received a downward departure under § 4A1.3(b). When considering a *Preacely* challenge, we ask only whether the district court realized that it had the authority to make such a departure in the first place. *See Preacely*, 628 F.3d at 81. In the case before us, it may be that the court below understood its authority to depart horizontally but simply decided that a departure was unwarranted. The district judge, in fact, described Ingram as a "veteran" dealer, a "menace" who "made a *career* selling drugs to a vulnerable population in the public housing project" where he lived. Sent. Tr. at 11, 15 (emphasis added).[4] At the same time, the district court also made statements suggesting that it was evaluating Ingram's culpability and risk of recidivism *on the basis of his career offender status. See, e.g.*, Sent. Tr. at 5 (Defense counsel: "I believe that Mr. Ingram has a substantial ability to be rehabilitated." The court: "With a criminal history Category of VI?"); Sent. Tr. at 8 (The court: "When you get to criminal history Category VI and you're 30 years old, that's—you've been involved with the law a lot."). While not dispositive, it was this kind of "repeated emphasis on [the defendant's] status as a Category VI career offender"

---

[4] The 44-month downward departure which the district court did give Ingram seems to have been motivated by a point Ingram himself made at sentencing: namely, that he was a drug-addicted member of the very same "vulnerable population" the district court blamed him for targeting. *See* Sent. Tr. at 21 (Ingram: "[T]he people you talking about is me, Your Honor, that you looking at is me. I'm part of them—them addicts."); 25 (The Court: "I'm going to give him the benefit of some of the things he said and give him a little bit more leniency th[a]n maybe I otherwise would have done.").

that led the *Preacely* majority to question whether the district court thought that criminal history category VI was mandatory. *Preacely*, 628 F.3d at 80.

In the end, however, these questions are not properly before us. Neither party has so much as mentioned *Preacely* in its briefs on appeal. And we can hardly fault the district court for failing to discuss its power to depart from category VI when no one requested that it do so. In briefing and at the sentencing hearing, Ingram's counsel offered a full-throated, well-argued plea for a non-guidelines sentence. What Ingram did not request was a pre-*Booker* departure to a *different* guidelines range reflecting a more appropriate criminal history. To the contrary, Ingram's pre-sentencing memorandum explicitly agreed that the 188-235 month range was procedurally correct. Def's Sent. Mem. at 2. Never having been made, any procedural argument possibly open to Ingram under *Preacely* must be deemed forfeited.[5]

---

[5] A few further comments about procedural unreasonableness are made necessary by Judge Raggi's powerful concurring opinion.

Judge Raggi's concurrence seems to me mostly to show her deep and continuing disagreement with *Preacely*. *See post* at 1-12. She does argue that the sentencing judge here, more so than the judge in *Preacely*, clearly knew that he could make a horizontal departure. On that we simply disagree. While I acknowledge that the question is closer in this case than in *Preacely*, I believe that, even here, raising a *Preacely* challenge on appeal might not have been useless, had the issue been properly presented to the district court. While I do not disagree with Judge Raggi that the facts in this case may have argued less powerfully for a horizontal departure than did those in *Preacely*, my point is simply that raising the issue to the district court would not have been fatuous. Putting aside Judge Raggi's *post hoc* rationalizations for counsel's failure to mention *Preacely*, *see post* at 11-12, I worry that the case was not raised by either side in this litigation simply because they had not grasped its import—as defense counsel admitted at oral argument.

Putting these points aside, the thrust of Judge Raggi's concurrence—her critique of sequential departures, or what I have called the doubled exercise of discretion under § 4A1.3(b) and *Booker*—applies every bit as much to *Preacely*. This does not mean that her argument has no force, but only that what force it has proved insufficient to persuade the previous panel.

B.  Substantive Reasonableness

Turning, then, to the argument Ingram *did* make on appeal: as I have already indicated, I agree with the Court's holding that Ingram's sentence is not substantively unreasonable under our precedents. But I do so with three qualifications.

First, when our Court says that a sentence like Ingram's is "substantively reasonable," we are using a legal term of art. Speaking in ordinary language—that is, stepping back from our labyrinthine and often draconian sentencing law—I believe that there is nothing "reasonable" about sending a man to prison for *twelve years* to punish him for a non-violent, $80 drug sale. Whether judged in terms of the money that will be spent to house and feed Ingram over the next twelve years,[6] the disruption that will be inflicted on the lives of Ingram's children, the missed opportunity for meaningful rehabilitation,[7] or the expressive condemnation that Ingram's crime deserves,[8] a prison term of this duration is simply not a reasonable thing to impose.

But of course, that is not what we mean when we say that Ingram's sentence is "substantively reasonable." We mean not that it makes sense, but—as the Court's opinion today rightly notes—that it is "located within the range of permissible decisions," *Cavera*,

---

[6] At current rates, the cost of Ingram's incarceration will range somewhere between $252,000 and $407,000. *See* U.S. Gov't Accountability Office, *Bureau of Prisons: Eligibility and Capacity Impact Use of Flexibilities to Reduce Inmates' Time in Prison* 19 fig. 3 (2012).

[7] *See United States v. Leitch*, No. 11-CR-609 (JG), 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013); Mosi Secret, *Outside Box, Federal Judges Offer Addicts a Free Path*, N.Y. Times, Mar. 1, 2013 at A1.

[8] If the length of sentence is meant, at least in part, as a measure of society's condemnation of a given act, what are we to make of a sentence which punishes a one-gram sale of crack more severely than New York's minimum sentences for first degree rape, kidnapping, or assault with a deadly weapon? *See* N.Y. Penal Law § 70.02.

550 F.3d at 191, a range that is informed but not determined by the sentencing guidelines, which themselves quantify past practice.[9]

This brings me to my second qualification. Judge Raggi may have been right to say in *Preacely* that finding the defendant's 94-month sentence substantively unreasonable "would be difficult . . . under our precedent." *Preacely*, 628 F.3d at 86 (Raggi, *J.*, dissenting).

---

[9] Judge Raggi worries that labeling a sentence substantively reasonable yet absurd "risks calling the law into disrepute." *Post* at 13. Here Judge Raggi conflates what is reasonable under current law with the reasonableness of that law itself.

It would certainly be strange for us to say that something within a judge's complete discretion is at once substantively reasonable and absurd. Sentencing, however, is not defined by complete judicial discretion. The legislature tells judges that we must do certain things in regard to sentencing, and the legislature's judgment thereby defines what sentences lie within the pale. Such sentences cannot be found substantively unreasonable without infringing on the prerogative of the legislature.

And yet, we judges have a right—a duty even—to express criticism of legislative judgments that require us to uphold results we think are wrong. We may alert Congress to mistakes or gaps in its legislation. *See* Robert A. Katzmann, *Courts and Congress* (1997). We may tell the legislature that we think a judgment it has made is mistaken, even absurd, *see United States v. Dorvee*, 616 F.3d 174, 184-87 (2d Cir. 2010), and urge Congress to reconsider its judgment, *see United States v. Douglas*, No. 11-5384-cr, 2013 WL 1501499, at *7 (2d Cir. Apr. 15, 2013); *United States v. Acoff*, 634 F.3d 200, 205 (2d Cir. 2011) (Lynch, *J.*, concurring). We may even go further and suggest that a judgment made by the legislature is headed towards unconstitutionality. *See United States v. Then*, 56 F.3d 464, 468-69 (2d Cir. 1995) (Calabresi, *J.*, concurring); *infra* note 10. To do these things is not to "call[] the law into disrepute," but rather to work with coordinate branches of government to prevent disreputable laws from enduring.

Thus while Judge Raggi's point—that an act *within* a judge's own discretion cannot be both absurd and reasonable—is well-taken, it does not speak to the problem raised by Ingram's sentence, or by the career offender guidelines more broadly. When the legislature tells judges that repeated small-scale drug transactions should be punished more severely than rape, *see supra* note 8, it may well be "substantively reasonable" for judges to impose such disproportionate sentences, as instructed, and yet appropriate for them to decry the instruction itself as absurd. (Judge Raggi, in her concurrence, takes issue with this description of Congress's instructions. *See post* at 13 n.9. But this is a career offender case, and in regard to such cases, Congress has decreed that the Sentencing Commission "shall assure that the guidelines specify a sentence . . . *at or near the maximum term authorized*." 28 U.S.C. § 994(h) (emphasis added).)

Still, without reaching that question, Judge Lynch's concurrence in *Preacely* clearly expressed his substantive concern about the length of sentences recommended under the career offender guidelines. *See id.* at 83 (Lynch, *J.*, concurring) ("[E]ven for a man with a history of multiple (if mostly minor) criminal convictions (almost exclusively tied to the possession and sale of narcotics), a sentence of nearly sixteen years in prison for the possession of a few thousand dollars worth of cocaine seems remarkably severe.") Yet even assuming the substantive reasonableness of Preacely's 94-month sentence for 21 grams of crack, it obviously does not follow that a 144-month sentence for one gram of crack is similarly reasonable.

Nevertheless, Ingram's sentence also is hard to find unreasonable under our precedents, given the fact that our cases provide no precedent at all for striking down a career offender sentence on substantive grounds. Our substantive unreasonableness cases have something of a self-fulfilling character: never having said that *n* months is too many, we have no basis in precedent for saying that *n+1* months is beyond the pale.

To be clear, I am not saying that Ingram's sentence is substantively unreasonable. Were I to do so, this would be a dissent, not a concurring opinion. But I don't hesitate to say that a sentence of this length, for this crime, is headed towards unreasonableness—and is, in fact, well along that road.[10]

---

[10] We might compare this to laws which, due to changed circumstances, can be described as "heading toward unconstitutionality." *United States v. Then*, 56 F.3d 464, 469 (2d Cir. 1995) (Calabresi, *J.*, concurring). As I have previously urged, rather than reaching to strike down a law or, alternatively, "allowing legislative inertia to dominate," *id.*, courts should instead initiate a dialogue with lawmakers, putting them "on notice that a serious and thoughtful legislative review and reconsideration [is] in order and that failure to undertake such a review might in time result in judicial action . . . ." *Id.* The present case,

This leads, finally, to my third qualification. The closer a sentence comes to the boundary of the substantively reasonable, the more attentive will (and should) our procedural scrutiny be. I read *Preacely* to exemplify this approach: the record was at best ambiguous as to whether the district court had committed procedural error, yet substantive worries about Preacely's sentence made the very possibility of procedural error all the more salient. The wisdom of the *Preacely* majority's decision to remand for resentencing was borne out by the subsequent proceedings in that case: the district court—perhaps after taking what it may have believed to be a substantive hint—reduced Preacely's sentence from 94 to 72 months.

We should not follow the same course in the present case only, and I repeat *only*, because the potential procedural error in *Preacely*—the district court's possible misunderstanding of the defendant's request for a pre-*Booker* departure—was not argued to us in this case. My hope is that by reiterating *Preacely*'s distinction between pre-*Booker* adjustments *to* the guidelines range that is applied, and *Booker* departures *from* the applied guidelines range, this opinion will help make somewhat more effective the assistance given career offenders who might not fully deserve that label or the dramatic sentencing consequences it brings.

---

of course, involves not unconstitutionality but our capacity to find a sentence substantively unreasonable. And I speak here not (or not just) to Congress, but also to the Sentencing Commission and the district judges responsible for applying its guidelines.

REENA RAGGI, *Circuit Judge, concurring*:

In this case, in which Dwayne Ingram stands convicted of his third felony drug offense in ten years, the district court sentenced him to 12 years in prison, a variance from his otherwise applicable 188-to-235-month Guidelines range. Ingram appeals his sentence on a single ground: substantive unreasonableness. The members of the panel agree that this argument fails on the merits, a conclusion that might warrant summary affirmance. Here, we proceed by published opinion because our colleague, Judge Calabresi, wishes to file a concurring opinion discoursing on various topics, including (1) the possibility that a procedural challenge not raised in this case might be supported by United States v. Preacely, 628 F.3d 72 (2d Cir. 2010); and (2) the likelihood that Ingram's sentence, even if not substantively unreasonable, "is headed toward unreasonableness—and is, in fact, well along that road," ante at **[13]**. I write to explain why I concur in the decision to affirm without any such reservations.

1.      There Is No Basis for Suggesting *Preacely*-based Procedural Error

Judge Calabresi explains that he writes separately "to call attention to a procedural challenge that has been strangely absent from this case," and that would find support in United States v. Preacely, 628 F.3d 72, if that case were properly understood. Ante at **[1-2]** If I shared that view, I would be inclined to seek further briefing from the parties to ensure that the issue was considered in an adversarial context. In fact, I do not think this appeal presents any Preacely concerns, either as that case was actually decided or as Judge Calabresi would have it construed.

1

a.      The Procedural Error Identified in *Preacely*:  Judicial Misunderstanding As to
        the Binding Effect of Career Offender Criminal History Category VI

The procedural error identified in Preacely was the sentencing judge's mistaken belief

that he was bound to treat the career offender guideline, specifically, its assignment of a

criminal history category of VI, see U.S.S.G. § 4B1.1(b), as mandatory, despite the judge's

decision otherwise to mitigate defendant's Guidelines sentence.  See United States v.

Preacely, 628 F.3d at 80–81 (citing statements in which district court repeatedly emphasized

defendant's criminal history category of VI and its obligation to follow Guidelines, and

concluding therefrom that "[i]t is ambiguous whether the sentencing judge understood that

he was not required to treat Preacely as a 'sixth degree offender' and that the Career Offender

Guideline was not mandatory").[1]  As Preacely observed, a Guidelines policy statement

specifically recognizes a district court's discretion to grant a within-Guidelines departure

from a Guidelines criminal history category, see U.S.S.G. § 4A1.3(b)(1), even though that

discretion is strictly limited in the case of career offenders, see id. § 4A1.3(b)(3) (stating that

departure "may not exceed one criminal history category," i.e. from VI to V).

Ingram, like the defendant in Preacely, is a career offender who sought sentencing

leniency.  But, in contrast to Preacely, the record here does not support a conclusion that the

sentencing judge thought that he was "required" to treat Ingram as a category VI offender

---

[1] As the dissenter in Preacely, I disagreed with the majority's identification of
procedural error, and I continue to think that the case was wrongly decided for the reasons
stated in my opinion.  See id. at 86 (Raggi, J., dissenting).  Nevertheless, I recognize that
Preacely is controlling precedent.

2

or that the career offender Guideline was "mandatory." United States v. Preacely, 628 F.3d at 80. No such inference can be drawn from the mere fact that Judge Arcara twice referenced Ingram's criminal history category of VI. See United States v. Sero, 520 F.3d 187, 192 (2d Cir. 2008) (reiterating strong presumption that district courts understand scope of their discretion to apply Guidelines departures, which may be overcome only in "rare situation" where "record provides a reviewing court with clear evidence of a substantial risk that the judge misapprehended the scope of his departure authority" (emphasis in original)). Nor was Judge Arcara required specifically to reference his § 4A1.3(b) discretion to obviate such concern. See United States v. Crosby, 397 F.3d 103, 113 (2005) (reiterating that "robotic incantations" not necessary to demonstrate district court's proper consideration of Guidelines).

Indeed, the conclusion that this case presents no Preacely error is only reinforced by the context of the district court's two references to Ingram's criminal history category of VI, one in skeptical response to defense counsel's argument that Ingram had "a substantial ability to be rehabilitated," Sent. Tr. 5 ("With a criminal history Category of VI?"); and one in observing that Ingram's criminal history, when considered with his age, demonstrated that he had "been involved with the law a lot," id. at 8. Not only are these statements equally apt whether Ingram's career history category was VI or V,[2] but also they nowhere intimate that the district court thought itself powerless to depart from category VI or the career offender

_____

[2] Ingram's criminal history category was V even without a career offender enhancement.

3

guideline if circumstances warranted, the context that gave rise to concern in <u>Preacely</u>. <u>See</u> 628 F.3d at 80–81. Indeed, Judge Arcara elsewhere acknowledged that the proper application of the career offender guideline to a particular case "depends on a lot of the circumstances," Sent. Tr. 9, a statement consistent with recognition, rather than disavowal, of the court's authority to depart from that guideline, <u>see generally</u> <u>United States v. Mishoe</u>, 241 F.3d 214, 218 (2d Cir. 2001) (holding that § 4A1.3(b) departure must be based on "individualized consideration of the circumstances of a defendant's case"). Moreover, he specifically acknowledged defense counsel's argument that Ingram should be shown leniency because he was "not a typical career offender under the [G]uidelines," and nowhere indicated that his discretion to grant relief on that basis was in any way limited by an immutable criminal-history category. Sent. Tr. 14.

In sum, the record in this case does not admit procedural error of the sort recognized in <u>Preacely</u>.

b. *Preacely* Does Not Require Sequential Consideration of a Within-Guidelines § 4A1.3 Departure and a Non-Guidelines Variance

Judge Calabresi submits that <u>Preacely</u> makes a "subtle but important contribution . . . to our Circuit's law regarding career offenders" by clarifying that a court's discretion to make a horizontal departure under § 4A1.3(b) differs from its post-<u>Booker</u> discretion to impose a non-Guidelines sentence. <u>Ante</u> at **[2, 3-4]**. From this he infers a procedural obligation for sentencing courts to apply within-Guidelines departures, or at least a § 4A1.3(b) departure, before exercising broader <u>Booker</u> variance discretion. I disagree.

4

First, it is by no means clear that the sentencing consideration afforded in <u>Preacely</u> was a post-<u>Booker</u> variance rather than a within-Guidelines departure pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1. <u>See</u> <u>United States v. Preacely</u>, 628 F.3d at 75. Thus, I am not convinced that <u>Preacely</u> considered—much less drew—the distinction between within-Guidelines departures and Guidelines variances urged by Judge Calabresi.

Second, even assuming such a distinction, it would have been significant in <u>Preacely</u> only because the district court's mistaken belief that it was bound by criminal history category VI appears to have infected its exercise of any other discretion to mitigate sentence. But nowhere in <u>Preacely</u> did this court suggest that, even in the absence of such an infecting mistake, it would be procedural error for a sentencing court not to engage in the "doubled exercise" of discretion urged by Judge Calabresi, <u>ante</u> at **[5]**, first deciding whether to grant a within-Guidelines departure, and only then, after fixing that departure, deciding whether to grant a sentencing variance.[3]

Such a rigid sequential requirement lacks support in the Supreme Court's post-<u>Booker</u> precedents, which, in clarifying the expansive scope of district court discretion to sentence outside applicable Guidelines, have used the terms "departure" and "variance" interchangeably. <u>Gall v. United States</u>, 552 U.S. 38, 50 (2007). The Court has also observed that district courts "may depart" from the Guidelines "<u>either</u> pursuant to the Guidelines <u>or</u>,

---

[3] As these two points make clear, I write not to express continuing disagreement with <u>Preacely</u>, as Judge Calabresi suggests, <u>see</u> <u>ante</u> at **[10]** n.5, but rather to show that <u>Preacely</u> never considered, and certainly never announced, the doubled-exercise-of-discretion requirement that Judge Calabresi purports to discover there, <u>see</u> <u>ante</u> at **[5-7]**.

5

since <u>Booker</u>, by imposing a non-Guidelines sentence," <u>Rita v. United States</u>, 551 U.S. 338, 350 (2007) (emphasis added). In so doing, it is not the sequence of the sentencing court's inquiry that matters, but its demonstration of "a reasoned basis" for its sentencing decision.[4] <u>Id.</u> at 356 (recognizing that degree of explanation required will vary with circumstances).

Even before the Supreme Court thus emphasized the enhanced flexibility of district courts' post-<u>Booker</u> sentencing discretion, this court had recognized that sentencing judges were not required to resolve all Guidelines-related issues "if the judge has fairly decided to impose a non-Guidelines sentence" in any event. <u>United States v. Crosby</u>, 397 F.3d at 112 (referencing complex issues). Relying on <u>Crosby</u>, we recently summarily rejected a claim of procedural error based on the district court's failure to consider within-Guidelines departures before opting for an above-Guidelines variance. <u>See</u> <u>United States v. McGowan</u>, 315 F. App'x 338, 341–42 (2d Cir. 2009) (summary order); <u>see also</u> <u>United States v. Diosdado-Star</u>, 630 F.3d 359, 362–65 (4th Cir. 2011) (rejecting claim of procedural error based on district court's failure to address within-Guidelines departure before imposing above-Guidelines sentence); <u>cf.</u> <u>United States v. Simmons</u>, 343 F.3d 72, 78–79 (2d Cir. 2003) (rejecting "mechanistic, step-by-step" procedure for calculating within-Guidelines upward departures (internal quotation marks omitted)).

---

[4] The Supreme Court has since recognized that "'[d]eparture' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." <u>Irizarry v. United States</u>, 553 U.S. 708, 714 (2008) (holding that Fed. R. Crim. P. 32(h) applies only to departures, not variances). Nevertheless, <u>Gall</u> and <u>Rita</u> signal that the Court has by no means conditioned the exercise of <u>variance</u> discretion on a preceding exercise of any possible <u>departure</u> discretion.

Judge Calabresi nevertheless suggests that a doubled exercise of discretion—first within the Guidelines and then under Booker—is warranted because (1) the Sentencing Commission favors it; and (2) the departure point for a Booker variance matters, even when courts are not bound by it. See ante at **[5]**. In support of the first conclusion, he points to the Commission's retention, even after Booker, of policy statements identifying appropriate grounds for departures. See, e.g., U.S.S.G. §§ 4A, 5K. As to the second, he cites social science literature on the human tendency to be influenced by "anchoring effects." I find neither point convincing.

The fact that the Commission, after Booker, continues to identify grounds for possible upward and downward departures is consistent with its obligation to provide guidance to sentencing courts based on its empirical studies of thousands of sentences and its efforts to implement legislation reflecting Congress's sentencing policies. That hardly means that courts are procedurally required to decide whether, and to what extent, Commission-identified grounds warrant within-Guidelines departures before courts can grant a Guidelines variance.[5] Indeed, in Preacely, even though Judge Lynch recognized the

_____

[5] While the Commission has recommended that Congress require district courts to "evaluate departures within the Guidelines and only then consider the § 3553(a) factors," U.S.S.C., Report on the Continuing Impact of *United States v. Booker* on Federal Sentencing 114 (Dec. 2012), in the absence of such legislation, I am not inclined to recognize such a procedural requirement. To the extent the Commission's recommendation implies that within-Guidelines departures can be decided without reference to § 3553(a) factors, I respectfully disagree. Virtually every within-Guidelines departure decision is informed by one or more § 3553(a) factors. Further, insofar as the Commission's post-Booker recommendations are animated by a belief that Congress should "statutorily require district courts to give 'substantial weight' to the guidelines," id., courts should proceed cautiously

7

usefulness of giving separate consideration to departure grounds having <u>different</u> bases, he rejected the idea of "any mandatory sequencing of consideration of grounds for departure." <u>United States v. Preacely</u>, 628 F.3d at 86 (Lynch, J., concurring).

"Anchoring effect" analysis warrants no different conclusion, particularly where, as here, the proposed "anchor" is not the applicable Guidelines range attributable to the Sentencing Commission, which district courts are required to calculate, <u>see</u> <u>Gall v. United States</u>, 552 U.S. at 49, but a within-Guidelines departure chosen by the same judge empowered to grant a Guidelines variance. Insofar as Judge Calabresi states that "a horizontal departure is a decision to shift to a new guidelines range," and concludes therefrom that "[t]hereafter, a court must choose whether to depart from that new range in light of the statutory sentencing factors outlined at 18 U.S.C. § 3553(a)," <u>ante</u> at **[4]** (emphasis added), I respectfully disagree with both his premise and conclusion.

A horizontal departure does not produce a "new" applicable Guidelines range. <u>See</u> U.S.S.G. § 1B1.1 cmt. 1(E) (defining "departure," for purposes of § 4A1.3, as "assignment of a criminal history category other than the otherwise applicable criminal history category, <u>in order to effect a sentence outside the applicable guideline range</u>" (emphasis added)); <u>see also</u> <u>United States v. Jones</u>, 369 F. App'x 171, 172 (2d Cir. 2010) (summary order) (holding that § 4A1.3 departure does not change applicable Guidelines range but, rather, "imposes a

---

before endorsing them, <u>see generally</u> <u>Kimbrough v. United States</u>, 552 U.S. 85, 113–14 (2007) (Scalia, J., concurring) (cautioning that anything that puts "thumb on the scales" in favor of Guidelines sentence raises Sixth Amendment concerns).

8

sentence <u>outside</u> the calculated range" (emphasis in original)). Under the mandatory Guidelines scheme, district courts granting horizontal departures were required to select sentences within the range provided for the criminal history category to which they had departed, <u>see</u> <u>United States v. Coe</u>, 895 F.2d 405, 412-13 (2d Cir. 1989); <u>accord</u> <u>United States v. Tropiano</u>, 50 F.3d 157, 162 (2d Cir. 1995), which may have seemed to bind them to a "new" Guidelines range.[6] But, in fact, the applicable Guidelines range always remained as originally calculated.

Insofar as Judge Calabresi cites literature discussing how "anchoring effects" can <u>irrationally</u> influence human behavior, <u>see</u> <u>ante</u> at **[6]** nn.1–2, I fail to see how this point is relevant to whether a procedural requirement to a reasonable sentence is the sequential application of a within-Guidelines departure and a sentencing variance.[7] Rationality, rather

---

[6] Originally, this process required district courts to proceed sequentially from one criminal history category to the next, a requirement never imposed on vertical departures. <u>See</u> <u>United States v. Tropiano</u>, 50 F.3d at 162–63. That sequential process was soon recognized to be "rigid and mechanistic," <u>id.</u> at 162, and we increasingly excused sentencing courts from strict adherence to it as long as they adequately explained the reasons for a horizontal departure, <u>see</u> <u>United States v. Simmons</u>, 343 F.3d at 78.

[7] I am particularly perplexed by the conclusion Judge Calabresi draws from one such article: that "judges have been shown . . . to be influenced by prosecution requests" for particular sentences—the purported "anchor"—not only when they think the prosecutor is committed to securing justice, but when the judge knows the prosecutor's sentencing recommendations "<u>were randomly generated</u>." <u>Ante</u> at **[6]** n.2 (citing Birte Englich, Thomas Mussweiler & Fritz Strack, <u>Playing Dice with Criminal Sentences: The Influence of Irrelevant Anchors on Experts' Judicial Decision Making</u>, 32 Personality & Soc. Psychol. Bull. 188 (2006) (showing effect of rolled dice on German judges' sentencing choices) (emphasis in original)). The article supporting this extraordinary view of sentencing judges is based on studies involving only hypothetical sentencing scenarios. As any judge with sentencing experience knows, a wide chasm separates the making of decisions that really

9

than irrationality, is the operating presumption in affording the Sentencing Guidelines continued consideration even after Booker, i.e., (1) the Sentencing Commission rationally and responsibly identifies applicable Guidelines ranges based on its superior access to extensive empirical data and its efforts to implement sentencing legislation, see Gall v. United States, 552 U.S. at 46; and (2) sentencing courts rationally and responsibly consider applicable Guidelines ranges with the benefit of their own unique insights into a particular defendant and his crime, see id. at 50–52. Once a district court considers the applicable Guidelines range and decides not to sentence within that range, nothing in Gall, or any other controlling precedent, requires a district court to recalculate the Guidelines based on any within-Guidelines departure before considering a possible variance from that new range.

Indeed, such a doubled exercise of discretion would serve little purpose in ensuring a reasonable sentence in this case. Ingram's counsel—in what can only be described as an exemplary sentencing memorandum—cogently and forcefully argued six reasons not to

---

deprive another person of liberty from the making of hypothetical decisions that do not, rendering analogies suspect. Further, while my familiarity with the administration of criminal justice east of the Rhine is limited, my direct experience with that same subject in the district courts of the Second Circuit spans more than three decades. During that time, I have never known a federal prosecutor in this circuit to submit a "randomly generated" sentencing recommendation to a district court. More to the point, I have never known a district judge to allow him- or herself "to be influenced by prosecution [sentencing] requests which [the judge] knew were randomly generated." Ante at **[6]** n.2 (emphasis in original). To the extent district judges have been "influenced" by properly generated prosecution sentencing recommendations, they have also been "influenced" by properly generated defense recommendations. This is contemplated, rather than prohibited, by law. See Fed. R. Crim. P. 32 (i)(1)(c). Moreover, such recommendations are almost invariably submitted with supporting reasons, and thus their weight depends on the persuasiveness of those reasons.

10

sentence defendant as a career offender. Whether these arguments were applied to a § 4A1.3

departure or a Guidelines departure, the district court would have to consider the same

§ 3553(a) factors. Moreover, the practical effect of requiring a § 4A1.3 departure to be

considered before a sentencing variance would have been to apply a powerful brake—even

if only temporarily—to the mitigation of Ingram's career offender sentence. See U.S.S.G.

§ 4A1.3(b)(3)(A) (strictly limiting horizontal departure for career offenders to one criminal

history category). A defense attorney seeking more consideration might well decide to

appeal directly to the district court's broad variance discretion without reminding it of the

§ 4A1.3(b)(3)(A) limitation—let alone its underlying rationale, see 28 U.S.C. § 994(h)(1)(2)

(requiring that Guidelines ensure that career offenders serve prison sentences "at or near the

[statutory] maximum)—lest this dissuade the district court from granting the larger variance

sought.[8] In any event, in the absence of any misunderstanding about the possible binding

---

[8] Thus, I would not fault defense counsel for failing to cite § 4A1.3(b) or our decision in Preacely to the district court. See ante at **[1-2]** Indeed, any experienced defense counsel would recognize that Ingram would not compare favorably with the Preacely defendant. While the latter may have sold more crack than Ingram and had more prior convictions, ante at **[8]**, he also had undergone an extraordinary rehabilitation prior to sentencing, overcoming his drug addiction, securing gainful employment, supporting his wife and child, and serving as a youth advisor for a gang prevention program. Further, he had rendered significant assistance to law enforcement authorities in solving two murders, apprehending a fugitive, and securing arrests or convictions of persons involved in drug dealing, firearms trafficking, credit card fraud, and multiple robberies. See United States v. Preacely, 628 F.3d at 77. By contrast, by the time of his sentencing, Ingram could show no actual rehabilitation from the pattern of drug dealing, drug addiction, and lack of lawful employment or family support that had characterized the whole of his adult life despite various assistance programs made available to him during many earlier periods of court supervision. He could only profess an intent to rehabilitate himself in the future, something the district court was entitled to view with skepticism. See id. at 85 (Lynch, J. concurring) (observing that "[o]nce caught, every

11

effect of a criminal history category of VI, as identified in <u>Preacely</u>, I do not see how Ingram

was prejudiced by the fact that the district court failed to come to the full stop required by

§ 4A1.3(b)(3)(A) before proceeding to grant a sentencing variance.

In sum, there is no meritorious procedural challenge "strangely absent" from this case.

<u>Ante</u> at **[1]**.

2.    <u>There Is No Basis for Suggesting that the Sentence in this Case Is "Well Along" the
      Road to Substantive Unreasonableness</u>

Although Judge Calabresi votes to affirm Ingram's challenged sentence, he states that

"a sentence of this length, for this crime, is headed toward unreasonableness—and is, in fact,

well along that road." <u>Ante</u> at **[13]**.  To explain how we can affirm a sentence that he thus

decries, Judge Calabresi submits that "substantive reasonableness" is a term of art that asks

not whether a sentence "makes sense," but only whether it is "located within the range of

permissible decisions" available to the district court.  <u>Ante</u> at **[11]**.  The suggestion that a

sentence can be both substantively reasonable and absurd risks calling the law into

disrepute.[9]

---

criminal knows that it is time to feign remorse and rehabilitation, and every judge has seen
many defendants who do exactly that").

    [9] Judge Calabresi acknowledges this concern.  Nevertheless, he admits such a
possibility because sentencing choices are sometimes dictated by Congress: "The legislature
tells judges that we must do certain things in regard to sentencing, and the legislature's
judgment thereby defines what sentences lie within the pale."  <u>Ante</u> at **[12]** n.9.  Judge
Calabresi submits that, although such sentences "cannot be found substantively unreasonable
without infringing on the prerogative of the legislature," judges may appropriately tell
Congress that its choices are "mistaken, even absurd." <u>Ante</u> at **[12]** n.9.  I respectfully
suggest that this reasoning is more confusing than helpful to our substantive reasonableness

I submit that deciding that a sentence falls within "the range of permissible decisions" qualifying as substantively reasonable necessarily decides that the sentence makes sense. As our precedents recognize, this does not engage us in a pinpoint inquiry. "Sentencing is not . . . a precise science," and "[r]arely, if ever, do the pertinent facts dictate one and only one appropriate [i.e., sensible] sentence." United States v. Jones, 531 F.3d at 174. Precisely because relevant facts frequently point in different directions, "even experienced district judges may reasonably differ, not only in their findings of fact, but in the relative weight they accord competing circumstances." Id. Thus, "in the great majority of cases, a range of sentences . . . must be considered reasonable," i.e. sensible. Id. Accordingly, when, on

jurisprudence.

First, while substantive reasonableness review is highly deferential, it is not so limited that courts "cannot" find unreasonable a sentence within a legislatively prescribed range. See, e.g., United States v. Dorvee, 616 F.3d 174, 188 (2d Cir. 2010) (finding sentence at statutory maximum substantively unreasonable). Thus, the fact that Congress plays a role in dictating sentencing ranges cannot justify holding a sentence both substantively reasonable and absurd.

Second, after Booker, Congress constrains courts' sentencing discretion only insofar as it enacts mandatory minimum and maximum sentences. Here, Congress dictated that Ingram be incarcerated for no less than one and no more than 40 years. See 21 U.S.C. § 860(a). It was the district judge who chose the challenged 12-year sentence—well removed from either the mandated minimum or maximum. In these circumstances, holding that sentence substantively reasonable while decrying it as absurd, says almost nothing to Congress and certainly does not avoid calling the law into disrepute.

A final point: my colleague identifies sentencing absurdity in Congress's "tell[ing] judges that repeated small-scale drug transactions should be punished more severely than rape," ante at [12] n.9. The conclusion is more inflammatory than accurate as applied to this case. Compare N.Y. Penal Law § 70.02 (prescribing five-year minimum and 25-year maximum prison term for first-degree rape) with 21 U.S.C. § 841(b)(1)(C) (providing for prison term of zero to 20 years for trafficking in less than 28 grams, or unspecified quantity, of crack); id. § 860(a) (prescribing minimum sentence of one year and doubling § 841(b) maximum for drug trafficking within 100 feet of school or public housing facility).

13

appeal, we "patrol the boundaries of reasonableness" to determine whether a sentence falls outside this range, United States v. Cavera, 550 F.3d at 191, we identify the few cases that, even when we accord proper deference to the district courts, cannot be said to make sense.[10]

Just as I disagree with the premise that a nonsensical sentence can be substantively reasonable, I disagree with the conclusion that Ingram's sentence makes no sense. Judge Calabresi submits that "there is nothing 'reasonable' about sending a man to prison for twelve years to punish him for a non-violent, $80 drug sale." Ante at **[10]** (emphasis in original). In fact, the district court did not impose a 12-year sentence to punish Ingram just for a non-violent, $80 drug sale. The totality of relevant circumstances was more complex. See 18 U.S.C. §§ 3553(a), 3661.

Ingram had a series of drug convictions and arrests spanning almost a decade. Judge Calabresi dismisses these as "brush[es] with the law." Ante at **[1]**. To be sure, federal judges in this circuit have seen worse crimes, indeed worse drug crimes, than those committed by Ingram. Nevertheless, "brushes" is too dismissive a term given the real recidivism and public safety concerns identified by the district court. See Sent. Tr. 13 ("Well, there's a lot more

---

[10] The fact that we rarely encounter substantively unreasonable sentences reflects not a defect in our jurisprudence, see ante at **[12]**, but the conscientiousness of district judges in exercising their sentencing responsibilities. Indeed, in Gall, the Supreme Court emphasized that district courts have two advantages warranting general deference to their sentencing decisions: (1) their experience imposing scores of sentences each year, and (2) their unique ability to observe the defendant and to resolve factual disputes relevant to sentencing. See Gall v. United States, 552 U.S. at 51 (observing that district courts thereby gain "insights not conveyed by the record" that are often critical to identifying a just sentence (internal quotation marks omitted)).

14

than just one gram of cocaine [to consider]. We've got a whole record of being involved in dealing with drugs.").

Indeed, the 2010 crime underlying Ingram's instant conviction bore a disturbing similarity to his first drug felony conviction in 2003, in that each involved a pair of small-quantity crack sales to undercover officers, taking place at the very same location, Church Street and Wasson Avenue in Lackawanna, New York, the site of the Gates Public Housing Project. These facts, by themselves, suggested that a decade of almost nonstop encounters with law enforcement authorities—arrests, convictions, a total of approximately four years in prison, followed by drug treatment programs and other forms of supervision—had not deterred Ingram one bit from trafficking crack. As Judge Arcara found, "[h]e made a career selling drugs to a vulnerable population in the public housing project." Sent. Tr. 15. The conclusion was only reinforced by Ingram's 2008 felony conviction for selling 13.6 grams of crack cocaine to an undercover officer in Woodlawn, New York, in exchange for $1,400. Meanwhile, in 2004, while on probation for his first drug conviction, Ingram was arrested by Lackawanna police who found 1/8 ounce of crack cocaine in his coat, for which conduct Ingram pleaded guilty to attempted possession.[11] Then in 2006, Ingram was arrested for various traffic violations and found in possession of $1,493.84, strongly suggesting continued drug trafficking given his lack of lawful employment.

---

[11] This New York class E felony was not a basis for treating Ingram as a career offender. At the time of this arrest, 25 bags of crack cocaine were also found on the ground nearby, but Ingram was not charged with these drugs.

Judge Arcara viewed Ingram's continued sale of crack in public housing as a particularly aggravating circumstance. This was not simply because Congress generally views such trafficking as aggravating. See 21 U.S.C. § 860(a) (doubling statutory maximum sentence for drug distribution within 1,000 feet of public housing). It was because, during previous parole terms, the Lackawanna Municipal Housing Authority had allowed Ingram to reside in public housing to maintain a stable family relationship with his wife and children, despite the fact that his drug crimes rendered him ineligible.[12] Judge Arcara was "amaze[d]" that, rather than availing himself of this consideration to secure employment and provide for his family, Ingram had not only failed to do either, but also reestablished his drug business on public housing property. Sent. Tr. 26.

Judge Arcara also viewed the public housing population to which Ingram trafficked as particularly vulnerable. Not only were Ingram's immediate customers likely to become dependent on drugs, but that dependency would also have serious collateral consequences for their families and neighbors insofar as drug trafficking frequently spawns other criminal activity, sometimes violent, from which persons with few if any other housing options could hardly escape.

On this record, even defense counsel recognized that no district judge would be inclined to sentence Ingram to a prison term between 21 and 27 months, his Guidelines range before application of the career criminal offender enhancement. Ingram's counsel urged a

---

[12] At the time of the instant offense, the Housing Authority was no longer granting Ingram this consideration. Instead, he was living in public housing without authorization.

16

sentence of eight years. The question before us is not whether an eight-year prison term was the most appropriate sentence. It is whether a 12-year term was outside the range of sentencing decisions reasonably available to the district court, so as to render Ingram's sentence substantively unreasonable. When the crime of conviction is considered in light of the aggravating circumstances just summarized, the answer to that question, as the panel recognizes, must be no. But further, these aggravating circumstances require me to take exception to my colleague's conclusion that the challenged sentence in this case was "headed toward unreasonableness," much less "well along that road."

Accordingly, I concur in the court's decision to affirm Ingram's judgment of conviction because there is no merit to his substantive unreasonableness challenge and because I do not share Judge Calabresi's Preacely-derived procedural concerns.

17